The **SECRETARY OF THE ARMY on Behalf of the DEPARTMENT OF DEFENSE and Baggett Transportation Company, Petitioners,**

v.

**TENNESSEE PUBLIC SERVICE COMMISSION and Robinson Freight Lines, Inc., Respondents.**

Court of Appeals of Tennessee, Middle Section, at Nashville.

Jan. 24, 1991.

William L. Deneke, Asst. U.S. Atty., Nashville, for Secretary of Army on behalf of the Dept. of Defense.

Daniel R. Loftus, Boult, Cummings, Conners & Berry, Nashville, for Baggett Transp. Co.

Steven E. Winn, Asst. Atty. Gen., Nashville, for Public Service Com'n.

Warren A. Goff, Memphis, for Robinson Freight Lines, Inc.

## OPINION

TODD, Presiding Judge.

The Secretary of the Army on behalf of the Department of Defense (hereafter the Secretary) and Baggett Transportation Company (hereafter Baggett) have filed a petition for review of a decision of the Tennessee Public Service Commission (hereafter the Commission) denying the application of Baggett for a certificate of convenience and necessity, and sustaining the intervening protest of Robinson Freight Lines, Inc. (hereafter Robinson), the present holder of a similar certificate.

### The Facts and Proceedings

Baggett and Robinson are competitors in the specialized business of interstate transportation of explosives. However, Robinson holds the only certificate for transporting such cargo between points in Tennessee. Thus, Baggett is prohibited from competing with Robinson in transporting explosives if both the origin and destination of the shipment are within Tennessee (intrastate shipments) which shipments are under the control of the Commission.

The United States Department of Defense (DOD) ships explosives intrastate (within Tennessee). Prior to June 21, 1989, Robinson transported all of such shipments. On that date, DOD suspended shipments via Robinson until July 14, 1989, because of perceived violations of safety and security rules of DOD.

On July 5, 1989, at the request of DOD, Baggett filed with the Commission an application for temporary authority to transport explosives during the period of Robinson's suspension by D.O.D. (June 21—July 14, 1989). Robinson opposed the application and no action was taken by the Commission.

On September 28, 1989, at the request of DOD, Baggett filed the present application. The reason for granting the application was stated therein as follows:

The Department of Defense needs an additional specialized carrier to ensure service on transportation of commodities as described in this application.

On October 9, 1989, Robinson filed a petition to intervene, which was granted on October 11, 1989. On November 3, 1989, the Secretary petitioned for leave to intervene in support of Baggett's application. Such leave was granted on November 6, 1989.

On April 6, 1990, an "initial order" was entered by an administrative judge, recommending denial of Baggett's application.

Exceptions to said order were filed by Baggett, the Secretary, and the Staff of the Commission, the latter of which stated:

The Legal Division agrees that the proposed "standing" order for emergency temporary authority is an unworkable administrative solution to the potential logistical problems faced by the DOD.

Further, and more important, the DOD's service problems have been a direct result of a monopoly held by the protestant in this case. The Administrative Judge denied the certificate of convenience and necessity based on potential harm to a carrier that has *no* competition for the intrastate traffic in question.

The Commission has unanimously rejected the proposed protection of motor carrier monopolies (*see* Maury County Limousine, July 18, 1989; Tune & Tune Boat Transportation, April 11, 1990).

The Legal Division urges the Commission to overrule the Administrative Judge's protection of a carrier with no competition. The certificate of convenience and necessity should be granted as applied for.

In support of the exceptions to the order, the Director of the Transportation Division of the Commission wrote to the Commission as follows:

As a member of the TPSC staff I have had an opportunity to review the case file, including the initial order dated April 6, 1990, concerning this docket. In as much as this application for authority exclusively involves the movement of Department of Defense (DOD) conventional munitions traffic, I believe my background as a former military transportation officer may assist the commission in better assessing the need for the service offered by the applicant. As background, for over 23 years I served as a transportation and logistics officer for the U.S. Air Force. For four of those years my responsibilities included worldwide traffic management over conventional air munitions for the U.S. Air Force. This responsibility included not only air munitions stocked at Air Force installations but also Air Force owned munitions stocks manufactured and/or stored at U.S. Army and U.S. Navy munitions plants/depots.

In reviewing the case file and initial order, it appears that insufficient consideration has been given to the unique nature of the military munitions transportation process and the need for extremely responsive support during or in anticipation of contingency operations.

The primary function of the armed services is to provide a deterrent to any adversary that might wish to take military action against our nation. When deterrence succeeds, we enjoy the peace we are experiencing today. We also experience the relatively few munitions movements necessary to support routine military training requirements.

When deterrence fails and the military shifts to a wartime footing, the munitions transportation situation changes dramatically. The military relies almost totally on the commercial transportation industry for freight (including munitions) movements within the continental U.S. Wartime or contingency operations require an immediate, high capacity response from munitions carriers in particular.

To support the above operations, DOD munitions traffic managers need immediate access to all the transport capacity that is available. Such movements can begin with only hours notice in the middle of the night or on holidays and weekends. Quite often such activity begins based on classified intelligence information which causes national command authorities to call for advanced movement of munitions prior to any public or official announcement of U.S. involvement in proposed or actual military action. Under these circumstances, it is simply impractical for the DOD to seek an ETA from this commission or any other regulatory body so as to permit timely movement of urgently needed munitions. The common practice for emergency response from motor carriers for DOD requirements is to have equipment and driver in place for loading within four hours of notification regardless of time or day. It is unlikely that this commission could respond in a timely manner with an ETA

to meet DOD requirements in a scenario as depicted above.

If this commission dictates there can only be one carrier to move DOD munitions routinely in Tennessee, the following undesirable results can be expected:

a. The DOD will be denied the benefits of carrier competition in rates and services that occur when monopoly power is permitted or directed to exist.

b. The other carrier(s) who otherwise could and would provide services during wartime or contingency operations would have no incentive to maintain transport capacity for contingencies as they are not beneficiaries of DOD traffic during peacetime.

c. The inability of DOD traffic managers to deny traffic to a monopolistic intrastate carrier would tend to dilute the effectiveness of traffic denied to that same carrier for service failures involving interstate transportation.

d. In a worst case scenario it is possible that in response to contingency operations, munitions may not move to Tennessee based military units (active duty or reserve forces) in time for those units subsequent deployment to world-wide locations designated by DOD command authorities. The Tennessee unit so deployed conceivably could have its ability to conduct its wartime mission seriously degraded due to lack of critical munitions.

Based on the above, it is the recommendation of this staff member that the commission reverse the denial of applicants petition for a CCN.

Two members of the Commission affirmed the order of the administrative judge in an order which stated:

1. That the Administrative Judge's Initial Order dated April 6, 1990, in this docket is hereby ratified, adopted and incorporated by reference in this Order as fully as though copied verbatim herein, including the findings and conclusions of the Administrative Judge which the Commission adopts as its own.

2. That emergency temporary authority shall be issued to Baggett Transportation Company in the event that the Department of Defense certifies to the Commission that Robinson Freight Lines, Inc. has been placed on non-use status. Emergency temporary authority shall remain in effect until Robinson Freight Lines, Inc. has been reinstated by the Department of Defense.

There is no record of any position taken by the third member of the Commission.

The issues presented by Baggett and the Secretary to this Court are whether the order is supported by substantial and material evidence or is arbitrary, capricious, or characterized by abuse or unwarranted exercise of discretion. Also presented is the statutory authority of the Commission to issue a "standing Order" for emergency temporary authority conditioned upon a future event.

The findings of the Commission are an unqualified and glowing approval of the qualifications of Baggett for licensure.

The same findings indicate flaws in the qualifications of Robinson which Robinson has promised to remedy.

The question before the Commission was not which of the carriers should be licensed, but whether both should be licensed. The Commission excluded the better qualified applicant and perpetrated the monopoly of the less qualified present certificate holder.

Examination of the order adopted by the commission discloses no ground for the denial of the application except that if the application were granted:

There is the prospect that Baggett could be used for intrastate shipping as well as Robinson. If this were to happen, the diversion could seriously affect Robinson.

There does not appear to be traffic available to support two carriers in this declining market. The potential impact upon Robinson as the existing carrier appears obvious.

T.C.A. § 4–5–322(h) provides for reversal of administrative decisions which are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(5) Unsupported by evidence which is both substantial and material in light of the entire record.

T.C.A. § 65–15–101 declares the duties of the Commission to:

(1) Regulate, foster, promote and preserve proper and economically sound transportation and authorize and permit proper coordination of all transportation facilities;

(2) Relieve existing and future undue burdens upon the highways arising by reason of their use by motor vehicles;

(3) Protect the welfare and safety of the traveling and shipping public in their use of the highways, and in their contact with the agencies of motor transportation and allied occupations; and

(4) Protect the property of the state in its highways from unreasonable, improper, or excessive use.

In determining whether a certificate should issue, T.C.A. § 65–15–107 requires the Commission to consider:

(a) The transportation service being furnished by any motor carrier on the route or in the territory in which the applicant proposes to operate;

(b) the service to be rendered and/or capable of being rendered by the applicant;

(c) the financial condition and character of the applicant;

(d) the character of the highways over which the applicant proposes to operate;

(e) the public demand or need for the service proposed;

(f) the likelihood of the proposed service being permanent and continuous;

(g) the effect which such proposed transportation service may have upon other transportation service being rendered;

(h) all other pertinent facts.

It is clear from this record that the determinative consideration of the Commission was subsection (g) above; but it appears that the Commission may have misconstrued said subsection (g).

The word, service, as a noun, has at least twenty meanings listed in Webster's Third International Dictionary, Unabridged. Its predominent meaning is the "act of serving", however, one listed meaning is an organization which renders a service, such as the armed services. It is possible that the words transportation service could refer to a trucking or transportation company, and it appears that the Commission may have so interpreted the statute so as to protect companies presently licensed to render service from loss by competition. If so, this Court must disagree.

The word "service" appears twice in section (g), above. It must be presumed to have been intended to mean the same in both instances. If "service" be interpreted to mean a transportation company, the second would mean:

(g) the effect which the company rendering the proposed service may have upon another company already furnishing the service.

If "service" be interpreted to mean the service or accommodation rendered to the public under certificate issued by the commission, then section (g) would mean:

(g) the effect which the additional transportation service offered by the applicant may have upon the cumulative service offered to the public by those certificated to render the service.

This Court holds that the second meaning was intended by the Legislature.

The words "transportation service" does not mean an individual, firm or corporation in the business of furnishing transportation. It means the accommodation of the transportation needs of the public. In this interpretation, the concern of the Commis-

sion is to be how well the public is served, and not how prosperous the licensee may be.

Of course, the needs of the public are not served if, by licensing an additional carrier, a presently licensed carrier is rendered insolvent and, as a result, the service available to the public is impaired. However, there is no evidence in this record that the granting of a certificate to Baggett will render the services of transporting explosives unavailable or less convenient in Tennessee.

In *Dunlap v. Dixie Greyhound Lines,* 178 Tenn. 532, 160 S.W.2d 413 (1942), the Public Utilities Commission granted an additional certificate over the protests of the previous holder of the only certificate. The Trial Court reversed, but the Supreme Court reversed the trial court and affirmed the action of the Commission stating:

A regulated monopoly in the motor carrier field is not authorized by Chapter 119, Public Acts 1933. The highways of the State belong to the people of the State. Many of these highways have been improved at large cost to the taxpayers. It is the convenience and necessity of the people of the State that must be given predominant consideration by the Commission, and not that of contending motor carriers operating free over these highways. It is within the power of the Commission, in proper cases, to permit several motor carriers to operate over the same route. No one carrier, by virtue of a certificate, obtains a monopoly over the route granted.

In *Johnson Freight Lines, Inc., v. Davis,* 174 Tenn., 51, 123 S.W. (2d), 820, 821, the court said, *inter alia:*

"The certificates of convenience and necessity granted to the complainants expressed no exclusive authority and conferred no exclusive franchise for the operation of truck lines over the highways of the State. Such certificates did not protect the complainants from lawful competition."

Several states, either by statute or judicial holding, are committed to the rule of regulated monopoly in the motor carrier field, but not Tennessee.

In *Hoover Motor Express, Inc. v. Taylor,* 185 Tenn. 88, 203 S.W.2d 366 (1947), the Public Utilities Commission granted a second certificate over the protest of the existing certificate holder. The Trial Court affirmed the order of the Commission. The Supreme Court affirmed and said:

The mere fact that the protestants may suffer some loss in revenue as result of the Commission's granting a certificate to the applicant does not support the conclusion that "it is contrary to the public interest and would harm rather than support sound economic transportation systems."

■ If no public demand or need for the service is demonstrated, then a substantial adverse impact upon a competing carrier's ability to operate and ability to provide service may support a denial of an additional certificate—*Service Transport, Inc. v. Bissell,* Tenn.App. 1985, 698 S.W.2d 347. There is no showing or finding in the present case that the granting of a second certificate will have a substantial adverse impact upon the ability of Robinson to operate and provide service.

■ It is not necessary to find an inadequacy in existing service or to provide the existing carrier an opportunity to cure the inadequacy before granting an additional certificate. *Tennessee–Carolina Transportation, Inc. v. Pentecost,* Tenn. 1962, 362 S.W.2d 461.

The rule might be otherwise if a cancellation of a certificate is contemplated, but no cancellation or contemplated cancellation is involved in the present case.

Robinson argues first that there is adequate evidence to support the decision of the Commission. This Court finds no evidence to support the ground on which the Commission could have based its decision, i.e. that the granting of a certificate would so adversely affect Robinson as to interfere with its service to the public. The actual ground of the decision, that Robinson would be adversely affected economically, is evident from the facts, but is not a

legal ground for the decision because a need for an additional carrier is shown.

Robinson next argues that "one error does not call for such drastic action". It is true that Robinson was "caught" in only one violation of D.O.D. safety and security regulations in intrastate transportation; but it was also "caught" in another serious violation in interstate transportation. Both violations are circumstantially persuasive that other similar violations occurred, but were not discovered. Moreover, Baggett admits that its safety and security do not fully comply with DOD regulations, and it has promised to upgrade its safety and security to comply. Neither the Commission nor the courts are in a position to "second guess" the methods of the federal authorities in assuring the safety of the public from danger of explosives or the security of operations of DOD from the danger of criminal terrorist activities. This subject is the very heart of the present controversy.

The transportation activities of both Robinson and Baggett are composed largely of hauling dangerous material which is vital to the defense of the United States. The Department of Defense has determined that the safety and security of its shipments within the State of Tennessee requires at least two carriers in order to assure the department a choice between carriers and, in event of failure of one carrier to provide an alternate carrier in place and ready for service. This record establishes without contradiction that the need of D.O.D. is urgent and important, and no legitimate reason is shown to deny it.

The foregoing answers the third argument of Robinson which is "There is no public demand or need for the services purposed (sic) by Baggett."

Robinson next argues that, "This is not a national emergency." This argument reflects the attitude which produced the disaster at Pearl Harbor on December 7, 1941. This Court takes judicial knowledge that the Department of Defense has the duty of maintaining constant readiness to cope with emergencies and cannot wait for an emergency to arise to prepare for it.

Moreover, this Court takes judicial knowledge that, at the present time, there is a massive world emergency which is taxing the facilities of the Department of Defense and threatens to produce a massive need for the very materials being transported by Baggett and Robinson. In these times of emergency, and between emergencies, the Department of Defense is entitled to special consideration of its needs, including transportation facilities.

Robinson next argues the adverse impact upon it by permitting competition. Consideration of such impact is permissible where no public demand or need is shown (*Service Transport v. Bissell,* supra). However, a public need and demand has been shown. The Department of Defense is the public. It is not merely a private individual or enterprise. It is the protector of every citizen of the United States. It is financed by taxes paid by the public. It is controlled by representatives selected by the public. How may an institution be more public?

Next, Robinson argues that, "The so called monopoly theory does not defeat the Commission's decision in this proceeding." The authorities already cited demonstrate that the public policy of Tennessee is to discourage rather than create or perpetuate monopolies except where necessary to provide a dependable public service. There is no evidence that the grant of a certificate to Baggett will interfere with the provision of a dependable public service. Indeed, all of the evidence is that the grant of the certificate will produce a more dependable public service in the transportation of dangerous commodities which are vital to the defense of this country.

■ Finally, Robinson argues that the "Standing Order" for an emergency certificate in event of certification of emergency need is an adequate provision for the needs of the public (meaning the needs of the Department of Defense). This Court disagrees.

In the first place, it is hardly appropriate for a state utilities commission to "second

guess" the national department of defense as to the needs of national defense.

In the second place, the "Standing Order" by its terms will not be implemented until certification satisfactory to the Commission is duly transmitted and acted upon. In an urgent emergency, the needs of the national defense may not permit time to follow the procedure of the Commission which, in the present case have not been outstandingly expeditious.

In the third place, the "Standing Order" is simply an excuse for preserving a monopoly which is not necessary for the public convenience and necessity and particularly the service of national defense. Both Baggett and Robinson are large interstate carriers. There is no evidence that either of them will go out of business or cease to serve the public whatever the final disposition of this dispute.

Robinson has no right to maintain its monopoly of business in Tennessee. Baggett has no right to a certificate to compete with Robinson in Tennessee. However, the public, and particularly the national Department of Defense, has a right to the best available transportation for its hazardous materials in Tennessee. It has wisely determined that such transportation will be best provided by a choice of carriers in Tennessee, just as it has a choice in interstate shipments. The Commission is not justified in denying that right to the Department of Defense thereby denying it to the people of the United States who have paid the costs of the highways over which the shipments travel.

Lastly, the "Standing Order" apparently ignores T.C.A. § 65–15–107(e) which prohibits an emergency certificate for less than one month nor more than six months.

The terms "arbitrary", "capricious" and "abuse of discretion" are harsh terms which this Court would prefer not to attribute to action of the Commission which is a respected body of respected members.

However, under evidence in the record, the facts found by the Commission and judicially noted by this Court, and the public policy of this State as reflected by the cited authorities, this Court finds that the action of the Commission is unsupported by evidence, is contrary to the public policy of the State and is a clearly unwarranted exercise of administrative discretion.

Accordingly, the administrative decision of the Commission is reversed and vacated, and the cause is remanded to the Commission for issuance of the Certificate of Convenience and Necessity described in the application of Baggett. Costs of this appeal are taxed against the protestant Robinson Freight Lines, Inc.

Reversed, vacated and remanded.

LEWIS and CANTRELL, JJ., concur.